*Daniel Beckwitt v. State of Maryland*, No. 794, September Term 2019. Opinion by Beachley, J.

**GROSS NEGLIGENCE INVOLUNTARY MANSLAUGHTER—RECKLESS DISREGARD FOR HUMAN LIFE—LESS CULPABLE FORM OF SECOND-DEGREE DEPRAVED HEART MURDER**

**SECOND-DEPRAVED HEART MURDER—EXTREME DISREGARD FOR HUMAN LIFE—HEIGHTENED FORM OF GROSS NEGLIGENCE INVOLUNTARY MANSLAUGHTER—REQUIRES LIKELIHOOD OR CERTAINTY OF DEATH**

Askia Khafra met Daniel Beckwitt in an internet chatroom where Khafra was seeking investors for his business idea—Equity Shark—a smartphone application that streamlined the process for ordinary people to invest in starter companies. Beckwitt agreed to invest in Equity Shark, and for approximately $10,000 he received a 5% stake in the business.

When Equity Shark failed to take off as expected, Khafra needed to repay Beckwitt for the $10,000 investment. Because Beckwitt feared a nuclear war between the United States and North Korea, he had been digging tunnels and a bunker underneath his home. Beckwitt allowed Khafra to repay the $10,000 debt by digging such tunnels at Beckwitt's home. On numerous occasions in 2017, Beckwitt would pick up Khafra and drive him back to his house to dig. Concerned with his privacy and in order to conceal his actual address, Beckwitt required Khafra to wear a blindfold during such drives. Additionally, Beckwitt did not allow Khafra into the first and second floors of the residence; Khafra was free to roam in the basement and the tunnels. Because Beckwitt did not own a cellular phone, he generally communicated with Khafra by using computer programs.

On September 10, 2017, in the early morning hours, Khafra sent Beckwitt a text message indicating that the power had gone out in the tunnels, that there was no airflow, and that he believed he smelled smoke. Khafra shortly thereafter clarified that he no longer detected smoke, but asked Beckwitt to fix the issue. Beckwitt, who was sleeping, did not see the messages until the next morning. When he saw the messages, Beckwitt notified Khafra that there had been a "pretty major electrical failure" and then switched power to the tunnels over to a different circuit. Beckwitt then went back to sleep.

Beckwitt awoke in the afternoon at approximately 3:00 p.m. and headed to the kitchen for some food. At about 4:00 p.m., he heard a beeping sound which he understood to be the carbon monoxide detector indicating a loss of power. After waiting twenty to

thirty minutes for the breaker to automatically reset, Beckwitt went to the basement to manually reset the breaker. While in the basement, Beckwitt did not see Khafra.

Beckwitt reset the breaker and as he headed upstairs, he heard an explosion and immediately saw smoke rising out of the kitchen floor. Beckwitt immediately returned to the basement to tell Khafra about the fire. Although Beckwitt did not see Khafra, he heard him yell "yo dude." Beckwitt was soon overcome by smoke and had to exit the basement. Once outside, Beckwitt yelled for his neighbors to call 9-1-1.

Firefighters quickly responded to the scene, but noted unusual challenges in putting out the relatively small fire. The unusual challenges stemmed from the fact that Beckwitt was a hoarder, and the floor of his basement was completely covered with trash, debris, and other objects that rendered navigation difficult. When the smoke cleared, the firefighters found Khafra's body in the middle of the basement.

The State charged Beckwitt with second-degree depraved heart murder and two theories of involuntary manslaughter: gross negligence and failure to perform a legal duty. Following a trial, the jury returned a verdict of guilty as to second-degree depraved heart murder, and guilty as to involuntary manslaughter. The verdict sheet did not distinguish between the two theories of manslaughter. Beckwitt timely appealed.

*Held*: Conviction for second-degree depraved heart murder reversed. Conviction for gross negligence involuntary manslaughter affirmed. The evidence is insufficient to support a conviction for depraved heart murder, but is sufficient to support a conviction for gross negligence involuntary manslaughter. Whereas gross negligence involuntary manslaughter, the "junior varsity" of depraved heart murder, requires a *reckless* disregard for human life, second-degree depraved heart murder requires an *extreme* disregard for human life.

The evidence in this case shows that Beckwitt demonstrated a reckless disregard for human life by hiring Khafra to dig tunnels underneath his home where Khafra was completely dependent upon Beckwitt for food and supplies, there was a history of electrical failures in the tunnels, the basement was completely cluttered with trash and debris making escape difficult in the event of an emergency, Khafra could not easily call for or receive emergency assistance because Beckwitt had sought to conceal his location, and the door leading from the basement to the outside may have been locked. Accordingly, the evidence was sufficient to support the conviction for gross negligence involuntary manslaughter.

Although the case law fails to draw a clear line of demarcation between "reckless disregard" and "extreme disregard," the cases discussing the sufficiency of evidence for depraved heart murder intimate that the likelihood or certainty of death distinguishes it from mere gross negligence involuntary manslaughter. Although the circumstances in this case were dangerous enough to sustain a conviction for gross negligence involuntary

manslaughter, they were not so egregious as to indicate that death was the likely, if not certain result, so as to satisfy the malice element of depraved heart murder. Accordingly, the evidence was insufficient to support the conviction for depraved heart murder.

As to Beckwitt's challenges regarding the prosecutor's closing arguments, Beckwitt generally failed to preserve his arguments for our review because the trial court, for the most part, sustained his objections as to the issues he raises on appeal. Beckwitt's challenges as to the jury instructions are unpersuasive. Finally, Beckwitt failed to preserve for our review his argument that the court erred by failing to hold a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978) because he failed to indicate what evidence should have been excluded from his trial based on the court's failure to hold such a hearing.

Circuit Court for Montgomery County
Case No. 133838C

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 794

September Term, 2019

_____

DANIEL BECKWITT

v.

STATE OF MARYLAND

_____

*Meredith,
Kehoe,
Beachley,

JJ.

_____

Opinion by Beachley, J.

_____

Filed: January 28, 2021

*Meredith, J., now retired, participated in the hearing and conference of this case while an active member of the Court. He participated in the adoption of this opinion after being recalled pursuant to Maryland Constitution, Article IV, Section 3A.

Pursuant to Maryland Uniform Electronic Legal Materials Act (§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

Following a trial that spanned over two weeks, a jury in the Circuit Court for Montgomery County found appellant, Daniel Beckwitt, guilty of second-degree depraved heart murder and involuntary manslaughter. The court sentenced appellant to twenty-one years' imprisonment, suspending all but nine, for depraved heart murder, and merged the conviction for involuntary manslaughter. Appellant timely appealed and presents the following four issues for our review:

1. Was the evidence legally sufficient to sustain [appellant's] convictions for depraved heart murder and involuntary manslaughter?

2. Did the trial court err by giving flawed jury instructions on murder and manslaughter?

3. Did the prosecutor's repeated improper remarks during closing and rebuttal closing arguments result in reversible error?

4. Did the suppression court err in denying [appellant's] request for a hearing pursuant to *Franks v. Delaware*[1]?

We hold that the evidence was legally sufficient to sustain appellant's conviction for gross negligence involuntary manslaughter, but was insufficient to sustain the depraved heart murder conviction. We reject appellant's remaining allegations of error. We shall therefore reverse appellant's conviction for depraved heart murder and remand for sentencing on the previously merged involuntary manslaughter conviction.

## FACTUAL AND PROCEDURAL BACKGROUND

This case involves the tragic death of Askia Khafra, a twenty-one-year-old who died while trying to escape a fire in appellant's basement. At the time of the fire, appellant was

---

[1] *Franks v. Delaware*, 438 U.S. 154 (1978).

twenty-six years old. The unfortunate series of events that brought Khafra and appellant together arose from Khafra's idea to create a smartphone application or "app" called Equity Shark. Khafra envisioned Equity Shark as streamlining the process for average people to invest in "starter companies" or small businesses that had not yet gone public and needed funding. Khafra expended considerable effort in developing the app. In furtherance of that goal, Khafra browsed internet chatrooms looking for investors. Khafra found his first investor—appellant—in such a chatroom.

Khafra pitched his business idea to appellant, and explained that he was looking for approximately $5,000 to go to San Francisco to apply for a Thiel Fellowship.[2] According to the parties' briefs, appellant invested approximately $10,000 for a 5% stake in Equity Shark.[3] Khafra and appellant went on to develop a close friendship. Khafra apparently became fascinated with appellant due to appellant's wealth and financial success. Khafra looked to appellant as someone who could help him grow Equity Shark, not just financially, but by assisting with computer coding and other efforts needed to develop the app into a viable business. Unfortunately, Equity Shark never took off as planned, and Khafra was not accepted for the Thiel Fellowship.

---

[2] The transcript incorrectly refers to this as the "Peter Field Fellowship." The specifics of the Fellowship itself, however, such as the age limit, the requirement to drop out of school in order to attend, and the Fellowship's general purpose, persuade us that Khafra was pursuing a "Thiel Fellowship" rather than a "Field Fellowship." *See* Thiel Fellowship, *FAQ*, https://thielfellowship.org/faq/ (last visited Jan. 8, 2021).

[3] There appears to be some discrepancy regarding the total amount of appellant's investment, but that discrepancy is immaterial to the outcome of this appeal.

In order to repay appellant's $10,000 investment, Khafra agreed to dig tunnels underneath appellant's house. Appellant had been building tunnels and an underground bunker beneath his home because he apparently feared a nuclear war with North Korea.

Khafra was not the first person to dig tunnels for appellant. Douglas Hart, who was approximately twenty years old at the time,[4] dug tunnels on several occasions from approximately October 2016 to April 2017. Logistically, Hart would drive his car to Maryland,[5] meet appellant at a McDonald's, and then appellant would require Hart to wear sunglasses with duct tape on them to obscure Hart's vision while appellant drove the two to appellant's home. Despite the fact that appellant actually lived in Maryland, he gave Hart the impression that they were going to Virginia. When Hart visited appellant to dig tunnels, he typically stayed in the tunnels and basement area for approximately a month at a time and understood that he was not allowed into the rest of the house. Hart indicated that he was physically incapable of leaving the basement/tunnel area, and that although there was a door from the basement leading directly to the outside, that door was kept locked and appellant always had the key. When Hart communicated to appellant that he wanted to go outside for fresh air or to get food, however, appellant would oblige him. Nevertheless, appellant required Hart to wear the duct-taped sunglasses upon going outside to prevent Hart from learning the location of appellant's house.

---

[4] Hart testified at the April 2019 trial that he was twenty-three years old. From this fact we extrapolate that he was approximately twenty years old when he began working in appellant's tunnels in October 2016.

[5] At trial, Hart indicated that he was living in New York.

3

In early 2017, Khafra began digging tunnels at appellant's home for $150 a day. Appellant typically picked Khafra up at Khafra's parents' house in the early morning hours, around 3:00 a.m., and like Hart, required Khafra to be blindfolded during the trip to appellant's house.[6] Khafra would dig underneath appellant's home approximately once a month to every two months, and would stay anywhere from a few days to a few weeks at a time.[7] During his stays, Khafra mostly remained in the bunker area in the tunnels. According to appellant's brief, "Khafra roamed freely in the basement and the tunnels, but he was not permitted to come up to the first or second floors of the residence." Rather than take showers, Khafra cleaned himself using disposable wipes. To relieve himself, Khafra would urinate and defecate in a bucket he kept in the tunnels. Every few days, Khafra and appellant used a winch system to haul the bucket from the basement to the first floor, where appellant himself would dispose of its contents in the first-floor bathroom. Because appellant did not own a phone, Khafra could only communicate with appellant from the basement and tunnels using Google apps such as Google Voice and V Chat.[8] Appellant

_____

[6] During a trip to appellant's home, Khafra learned that appellant actually lived in Bethesda, Maryland.

[7] Khafra's father testified at trial that he recalled Khafra going to appellant's house in January, February, March, April, and September of 2017.

[8] "Google Voice" is a program that "gives you a phone number for calling, text messaging, and voicemail." https://play.google.com/store/apps/details?id=com.google.android.apps.googlevoice&hl=en_US&gl=US (last visited Jan. 8, 2021).
    "V Chat" is a private messenger service that allows users to "communicate instantly while avoiding [text messaging] fees[.]" https://play.google.com/store/apps/details?id=com.wVChat_9255903 (last visited Jan. 8, 2021).

used numerous extension cords and power strips to provide electricity to the tunnels. In his interviews with police, appellant intimated his familiarity with the failing power cords and having to reset the circuit breaker.

On September 3, 2017, Khafra went to appellant's home to resume work in the tunnels. A week later, while digging in the tunnels on September 10 at 2:32 a.m., Khafra messaged appellant using Google Hangouts, stating "holy [s**t] bro there's no power down here." Approximately five minutes later, at 2:37 a.m., Khafra indicated that there was smoke in the basement. At 2:51 a.m., Khafra wrote again, stating that he no longer believed there was smoke in the basement, but that the lights had gone out and it was "pitch black down [there]" with no airflow. Khafra's message asked appellant to "please try to fix when you see this."

Appellant did not see Khafra's messages until he woke up at approximately 9 a.m. At 9:27 a.m., appellant wrote to Khafra that there had been a "pretty major electrical failure" and that appellant was switching the power over to a different circuit. Appellant then went back to sleep, and awoke at approximately 3 p.m. Appellant went downstairs from his second-floor bedroom to get something to eat, and at around 4 p.m., he heard a beeping sound coming from the carbon monoxide detector in the dining room. Appellant understood the beep to signify a loss of power, which he confirmed when he could no longer hear the refrigerator running. Appellant waited approximately twenty to thirty minutes, believing that the circuit breaker would reset itself. When the power failed to return, appellant went to the basement to manually reset the breaker. Appellant did not see Khafra while in the basement resetting the breaker.

5

On his way up the stairs from the basement to the first floor, appellant heard an explosion, which he believed to be either the refrigerator's compressor or the air conditioner. Appellant went to the kitchen to see if the refrigerator's compressor was working, and immediately saw smoke rising out of the kitchen floor. Appellant promptly headed back to the basement to tell Khafra that there was a fire, and that Khafra needed to get out. Appellant heard Khafra yell "yo dude," but he could not see him through all of the smoke. Fearing that he would not be able to take the basement stairs to the first floor, appellant exited the basement by unlocking the basement door that led directly to the outside.[9] Because he did not have a cellular phone, and because it would have been dangerous to return to his second-floor bedroom to call 9-1-1 from his computer, appellant began to yell for help. Appellant's neighbors called 9-1-1.

Firefighters from Montgomery County Fire and Rescue Service responded to appellant's home at approximately 4:23 p.m. The firefighters struggled to navigate through appellant's home to extinguish the fire, however, because, as appellant concedes, "[t]he home by all accounts was a hoarder's home." Put simply, appellant's home was filled with an extreme amount of debris, trash, and other objects that made navigation difficult. In fact, it took firefighters approximately a minute and a half to two minutes to traverse the short distance from the basement's side entrance to the fire. Firefighters extinguished the fire with two or three sprays of water lasting approximately fifteen to thirty seconds each.

---

[9] Although he could not remember for certain, appellant indicated that he "[thought he] had to" unlock the basement door to exit. Appellant could not recall whether the key was already in the door or whether he had it at the time, but told police it was "common" to keep the key in the door.

6

When the steam finally cleared, firefighters found Khafra's lifeless body in the middle of the basement.

**DISCUSSION**

I.     SUFFICIENCY OF THE EVIDENCE

Appellant first argues that the evidence was insufficient to sustain his convictions for depraved heart murder and involuntary manslaughter because his conduct was not, as a matter of law, sufficient to meet the elements of those crimes.

> When reviewing a criminal conviction for sufficiency of the evidence, [w]e will consider the evidence adduced at trial sufficient if, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crimes beyond a reasonable doubt.

*State v. Coleman*, 423 Md. 666, 672 (2011) (internal quotation marks omitted) (quoting *Facon v. State*, 375 Md. 435, 454 (2003)).  Our task, then, is to determine whether any rational trier of fact, after viewing the entire record in a light most favorable to the State, could have found, beyond a reasonable doubt, the essential elements for depraved heart murder and involuntary manslaughter.

A. *A Primer on Depraved Heart Murder and Gross Negligence Involuntary Manslaughter*

We begin with an examination of the rather murky legal landscape of depraved heart murder and involuntary manslaughter.  Depraved heart murder has been described as "one of the 'unintentional murders' . . . that is punishable as murder because another element of blameworthiness fills the place of intent to kill." *Alston v. State*, 101 Md. App. 47, 56 (1994) (quoting *Robinson v. State*, 307 Md. 738, 744 (1986)).  "The critical feature of

7

'depraved heart' murder is that the act in question be committed 'under circumstances manifesting extreme indifference to the value of human life.'" *Id.* (quoting *Robinson*, 307 Md. at 745). As to involuntary manslaughter, the Court of Appeals has recognized three varieties: (1) unlawful act manslaughter, which is "doing some unlawful act endangering life but which does not amount to a felony"; (2) gross negligence manslaughter, which is "negligently doing some act lawful in itself"; and (3) "the negligent omission to perform a legal duty." *State v. Thomas*, 464 Md. 133, 152 (2019) (first quoting *State v. Albrecht*, 336 Md. 475, 499 (1994); and then quoting *Mills v. State*, 13 Md. App. 196, 200 (1971)).

It is well-settled that the "gross negligence" theory of involuntary manslaughter is a less culpable form of depraved heart murder. *Id.* at 173 n.20 (citing Judge Charles E. Moylan, Jr., *Criminal Homicide Law* § 12.1, at 223 (2002)); *Dishman v. State*, 352 Md. 279, 299 (1998) (stating that the difference between depraved heart murder and gross negligence involuntary manslaughter "is one of the degree of culpability"); *see also* Judge Charles E. Moylan, Jr., *Criminal Homicide Law* § 12.1, at 223 (2002) (stating that "gross negligence manslaughter is the junior varsity manifestation of depraved-heart murder").[10] To understand the elements of the crimes of depraved heart murder and involuntary manslaughter, we look to Judge Moylan for guidance. In *Pagotto v. State*, Judge Moylan explained,

---

[10] Although depraved heart murder is often described in terms of being a more culpable manifestation of gross negligence involuntary manslaughter, we are aware of no authority that depraved heart murder may only arise from the grossly negligent modality of involuntary manslaughter. In other words, it seems possible that the negligent omission of a lawful duty variety of manslaughter could, in a proper case, be elevated to the more culpable crime of depraved heart murder.

On the matrix of blameworthy states of mind that will support a verdict of either civil liability or criminal guilt on the part of an unquestioned homicidal agent, one of those mental states is that in which the homicidal agent causes an unintended death by carelessly or negligently doing some act lawful in itself.

127 Md. App. 271, 276 (1999) (internal quotation marks omitted) (quoting *Dishman*, 352 Md. at 291), *aff'd* 361 Md. 528 (2000). The bottom of the negligence "matrix" represents the least culpable form of homicide—civil negligence. *Id.* Civil negligence may give rise to "heavy civil liability," but such negligence is "still something less than criminality." *Id.*

Moving up the scale of blameworthy negligence, the next culpable level "are those more 'gross deviations' from the standard of care used by an ordinary person where the negligent conduct can reasonably be said to manifest 'a wanton or reckless disregard of human life.'" *Id.* at 277 (quoting *Dishman*, 352 Md. at 291). Such conduct constitutes gross negligence involuntary manslaughter. *Id.*

Finally, the most culpable conduct on the negligence scale are "those acts of a life-endangering nature so reckless that they manifest a wanton indifference to human life." *Id.* Such conduct constitutes second-degree depraved heart murder. *Id.*

Regardless of the degree of reprehensible negligence, however, the standard is an objective one: the conduct must "[manifest] such a gross departure from what would be the conduct of an ordinarily careful and prudent person under the same circumstances so as to furnish evidence of an indifference to consequences." *Albrecht*, 336 Md. at 500. Additionally, the State must prove a causal connection between the negligence and the death. *Id.* at 499 (quoting *Mills*, 13 Md. App. at 200); *see also Thomas*, 464 Md. at 152. "This includes actual, but-for causation and legal causation." *Thomas*, 464 Md. at 152.

9

Regarding the line of demarcation between depraved heart murder and gross negligence involuntary manslaughter, Judge Moylan has noted that,

> Definitionally, the Maryland case law has yet provided no meaningful distinction between those last two levels of culpability. "[O]ur cases have not drawn a precise line between depraved heart murder and involuntary manslaughter." *Dishman v. State*, 352 Md. at 299, 721 A.2d 699. As an abstract matter, however, we know that there is—somewhere—such a line. There must be or else there is no legally cognizable distinction between murder and manslaughter.

*Pagotto*, 127 Md. App. at 277. We agree with and shall explore Judge Moylan's astute observation on this subject.

In *In re Eric F.*, this Court defined the indispensable component of depraved heart murder, stating, "The essential element of depraved heart murder is that the act in question be committed 'under circumstances manifesting *extreme indifference to the value of human life*.'" 116 Md. App. 509, 519 (1997) (emphasis added) (quoting *Robinson*, 307 Md. at 745). We explained,

> The question is whether the defendant engaged in conduct that created *a very high risk of death or serious bodily injury to others*. The murder may be perpetrated without the slightest trace of personal ill-will. Instead, the willful doing of a dangerous and reckless act with wanton indifference to the consequences and perils involved, is just as blameworthy, and just as worthy of punishment, when the harmful result ensues, as is the express intent to kill itself.

*Id.* at 519-20 (emphasis added) (internal citations and quotation marks omitted).

As to gross negligence involuntary manslaughter, the Court of Appeals has stated,

> In determining whether a defendant's actions constituted gross negligence, we must ask whether the accused's conduct, under the circumstances, amounted to a disregard of the consequences which might ensue and indifference to the rights of others, and so was *a wanton and reckless disregard for human life*. Stated otherwise, the accused must have

10

committed acts so heedless and incautious as necessarily to be deemed unlawful and wanton, manifesting such a gross departure from what would be the conduct of an ordinarily careful and prudent person under the same circumstances so as to furnish evidence of an indifference to consequences. It is only conduct which rises to this degree of gross negligence upon which a conviction of involuntary manslaughter can be predicated.

*Albrecht*, 336 Md. at 500 (emphasis added) (internal citations and quotation marks omitted).

The line between depraved heart murder and gross negligence involuntary manslaughter, then, appears to be as follows: depraved heart murder requires an "extreme indifference to the value of human life," *In re Eric F*., 116 Md. App. at 519 (quoting *Robinson*, 307 Md. at 738), whereas gross negligence involuntary manslaughter requires only "a wanton and reckless disregard for human life," *Albrecht*, 336 Md. at 500 (quoting *Duren v. State*, 203 Md. 584, 590 (1954)).

In his book *Criminal Homicide Law*, Judge Moylan suggests that part of the reason Maryland courts have struggled to distinguish between these two degrees of criminal negligence is because when appellate courts first recognized gross negligence involuntary manslaughter in the 1950s, judges did not anticipate that Maryland would proceed to recognize the more reprehensible crime of depraved heart murder thirty years later. Judge Charles E. Moylan, *Criminal Homicide Law* § 12.4, at 226-27 (2002). "When the time came to describe the *mens rea* of depraved-heart murder, the opinion writers discovered to their chagrin that the store of 'juicy' and lurid adjectives had been profligately exhausted by the rhetorical excesses of earlier opinion writers in the manslaughter cases." *Id*. at 227.

11

As we shall explain, despite the cloudy line of demarcation between the two criminally culpable levels of negligence, we conclude that appellant's conduct satisfies the criteria for gross negligence involuntary manslaughter, but falls short of what is required for depraved heart murder.

    B. *Appellant's Conduct Demonstrated Wanton and Reckless Disregard for Khafra's Life (Involuntary Manslaughter)*

Gross negligence involuntary manslaughter generally occurs in four contexts: automobiles, police officers, failure to perform a duty, and weapons. *Thomas*, 464 Md. at 154. In *Thomas*, however, the Court of Appeals posed a unique question: "[U]nder what circumstances the dangers of heroin would justify holding a dealer liable for involuntary manslaughter for supplying the means by which his customer fatally overdoses." *Id*. at 139. In an effort to resolve that question, the *Thomas* Court considered cases involving automobiles, police officers, and weapons to "create a helpful tableau" to guide its analysis. *Id*. at 154.

*Thomas* began by discussing automobile cases. An easily identified form of gross negligence occurs where a driver operates a vehicle in a reckless manner, such as by gratuitously speeding in a heavily congested residential area, and strikes and kills a pedestrian.[11] *Id*. at 154-55 (citing *Duren*, 203 Md. at 588-89). In *Duren*, the State produced evidence that the defendant was driving in a "heavily congested residential and business

<hr>

[11] The *Thomas* Court recognized that a criminal statute for "manslaughter by vehicle" preempts prosecution for common law gross negligence manslaughter, but noted that the cases concerning that statutory offense were still relevant in analyzing "gross negligence" in this context. *Thomas*, 464 Md. at 154.

area" of Baltimore City at 7:00 p.m. at a speed of at least 60 miles per hour—approximately 30 miles per hour above the speed limit. 203 Md. at 588-89. Notably, after Duren's vehicle skidded approximately 72 to 89 feet, it struck the victim with such force as to hurl him into the air and onto "the trunk of a car a number of feet away." *Id*. at 589. The evidence there sufficiently manifested "a wanton and reckless disregard for human life." *Id*. at 590.

Likewise, in *State v. Kramer*, 318 Md. 576 (1990), the evidence was sufficient to support a conviction for gross negligence manslaughter by vehicle. There, on a rural two-lane road, Kramer attempted to pass another vehicle in a no-pass zone, striking an oncoming vehicle while driving at least 75 miles per hour. *Id*. at 586-89. The facts also showed that Kramer was distracted while performing this maneuver. *Id*. at 589. Under such circumstances, "the evidence was legally sufficient for the jury to find on Kramer's part a wanton and reckless disregard of the rights and lives of others and so a state of mind amounting to criminal indifference to consequences." *Id*. at 593.

In *Johnson v. State*, however, the Court found that the circumstances were insufficient to support a conviction for gross negligence vehicular manslaughter. 213 Md. 527, 533-34 (1957). The evidence showed that Johnson was driving on a one-way, four lane highway in a non-residential area with "very light" traffic. *Id*. at 533. Additionally, there was contradictory evidence of Johnson's speed. *Id*. at 530. Relying on *Duren*, the Court focused on "whether, by reason of the speed in the environment, there was a lessening of the control of the vehicle to the point where such lack of effective control [was] likely at any moment to bring harm to another." *Id*. at 532-33. The Court concluded

13

that Johnson's conduct did not amount "to a wanton or reckless disregard of the rights and lives of others." *Id*. at 534.

The *Thomas* Court then turned to gross negligence involuntary manslaughter cases involving police officers. 464 Md. at 157. Notably, where a police officer is involved in negligent conduct resulting in death, the officer is held to a "heightened 'reasonable police officer under the circumstances' standard, rather than a reasonably prudent person standard." *Id*. at 157 (quoting *Albrecht*, 336 Md. at 487).

In *Albrecht*, Officer Albrecht was one of two officers responding to a reported stabbing. 336 Md. at 479. The suspect apparently left the scene in a vehicle driven by Rebecca Garnett. *Id*. The two officers eventually arrived at a townhouse complex where they spotted the suspect's vehicle, with the suspect and Garnett standing near the vehicle in the parking lot. *Id*. at 479-80. Officer Albrecht removed his shotgun from his cruiser and yelled at the suspect and Garnett because he believed they were going to attempt to escape. *Id*. at 480-81. Officer Albrecht then "'racked' the shotgun into its final stage of firing capability[,]" and aimed it directly at Garnett. *Id*. at 481. With his finger on the trigger, Officer Albrecht intended to turn and aim his gun at the suspect, but the weapon discharged, killing Garnett. *Id*. at 481-82. According to Albrecht's own testimony, at the time he fired, "he did not believe that [Garnett] posed any danger to him or to any other person[.]" *Id*. at 504. A fellow officer testified that "Garnett had 'done nothing' to warrant having a shotgun racked and aimed at her." *Id*. In upholding Officer Albrecht's conviction for gross negligence involuntary manslaughter, the Court of Appeals stated that Officer Albrecht manifested a wanton and reckless disregard for human life in "drawing and

14

racking a shotgun fitted with a bandolier and bringing it to bear, *with his finger on the trigger*, on an unarmed individual who did not present a threat to the officer or to any third parties, in a situation where nearby bystanders were exposed to danger." *Id*. at 505.

Lastly, the *Thomas* Court looked to *Mills v. State*, 13 Md. App. 196 (1971), a weapons case, to help map the contours of gross negligence involuntary manslaughter. 464 Md. at 159. In *Mills*, a sixteen-year-old boy took his father's pistol to a dance, then went into a bathroom with some friends to drink liquor. 13 Md. App. at 197. Mills, aware that there was a bullet in the chamber, pointed it at another boy, who slapped the gun out of Mills's hand, causing it to discharge and kill another boy. *Id*. at 198-99. In sustaining Mills's conviction for gross negligence involuntary manslaughter, this Court stated that "the introduction of the loaded weapon into a small room among five youths drinking liquor from a bottle, and the handling of the weapon by a person unfamiliar with its operation, including its loading and unloading, is plainly a grossly negligent act dangerous to life . . . ." *Id*. at 202.

With this "tableau" of cases in mind, the *Thomas* Court then considered whether the unique facts present there—the dangers of a specific heroin sale—constituted the wanton and reckless disregard for human life necessary to sustain Thomas's conviction.

In *Thomas*, the agreed findings of fact showed that the victim, twenty-three-year-old Colton Matrey, died of a heroin overdose.[12] 464 Md. at 147. Thomas, a heroin dealer

---

[12] Thomas entered a "hybrid plea," wherein Thomas agreed to the ultimate facts of the case, but maintained the ability to argue legal issues and evidentiary sufficiency on appeal. *Thomas*, 464 Md. at 140.

15

and user himself, would typically consume twelve bags of heroin a day, using four bags for a single shot. *Id*. at 148. Prior to Matrey's death, Thomas had sold heroin to Matrey "[a] few times." *Id*. at 149. Just hours before he was found dead in the early morning of June 26, 2015, Matrey called Thomas approximately twenty-seven times in a twenty-two-minute span. *Id*. at 145. This was unusual because Matrey typically called Thomas earlier in the day to purchase heroin. *Id*. at 149. Thomas sold Matrey four bags of heroin. *Id*. Thomas later told police that he believed Matrey was nineteen years old. *Id*. at 150.

After discussing numerous gross negligence involuntary manslaughter cases, including those mentioned above, the Court of Appeals provided the following guidance for determining the sufficiency of evidence for gross negligence involuntary manslaughter:

> there is no scientific test or quantifiable probability of death that converts ordinary negligence to criminal gross negligence. Rather, the inherent dangerousness of the act engaged in, as judged by a reasonable person . . . is combined with environmental risk factors, which, together, make the particular activity more or less "likely at any moment to bring harm to another."

*Id*. at 159 (quoting *Johnson*, 213 Md. at 533). The Court echoed the standard established in earlier cases:

> In sum, when determining whether an individual has acted with the requisite grossly negligent *mens rea* to be found guilty of involuntary manslaughter, the State must demonstrate wanton and reckless disregard for human life. This requires a gross departure from the conduct of an ordinarily careful and prudent person and a disregard or indifference to the rights of others. It also involves an assessment of whether an activity is more or less likely at any moment to bring harm to another, as determined by weighing the inherent dangerousness of the act and environmental risk factors.

*Id*. at 160-61 (internal citations and quotation marks omitted).

16

In examining the inherent dangerousness of distributing heroin and its attendant environmental risk factors, the Court of Appeals noted that Thomas knowingly engaged in selling heroin, a drug with the propensity to harm or possibly kill those who ingest it. *Id.* at 167. The Court next noted that Worcester County, where Matrey died, "ha[d] been consumed with heroin overdoses, some resulting in deaths, and that these overdoses [had] resulted in an acute awareness of the dangers of heroin." *Id.* at 168. Additionally, the Court found it "fair to infer that Thomas subjectively knew an overdose was possible based on his statement that [Matrey] 'couldn't have overdosed **off [the amount] I sold him**.'" *Id.*

The Court also noted the increased risk based on the unusualness of the transaction. *Id.* at 169. Namely, Thomas knew that Matrey was young, had been in prison, and called Thomas either 27 or 28 times in a twenty-two-minute span in addition to sending multiple text messages, and that the transaction occurred unusually late in the evening. *Id.* Additionally, because of Thomas's familiarity with heroin—his experience as a seasoned dealer coupled with his own personal use—the Court of Appeals inferred that Thomas was aware of the risks posed by heroin abuse yet "continued to sell the drug notwithstanding its danger." *Id.* at 170.

In concluding that the evidence was sufficient to support Thomas's conviction for gross negligence involuntary manslaughter, the Court held that

> Thomas sold heroin to a desperate young man, knowing that the consumption of heroin could be deadly. He had extensive experience with heroin—distributing it widely, in a manner sure to net a profit, and with such frequency that he travelled across state lines two to three times a week to procure it—and was knowledgeable of its dangers. Yet, he either willfully

17

failed to obtain the necessary information to help reduce the risks of his behavior, or he was indifferent to mitigating these risks. Either way, his conduct posed a high degree of risk to those with whom he interacted.

*Id*. at 171-72.

Recently, the Court of Appeals issued an opinion discussing the sufficiency of the evidence for gross negligence involuntary manslaughter where a mother accidentally suffocated her infant child while co-sleeping.[13] *State v. Morrison*, 470 Md. 86 (2020). In reversing the mother's conviction for involuntary manslaughter, the Court held that the mother did not engage in inherently dangerous conduct, *id*. 115, and that, although the evidence showed that the mother had consumed alcohol, she was not intoxicated or impaired at the time she smothered the infant, *id.* at 121-22.[14]

Against this legal backdrop, we return to the instant case. In analyzing the sufficiency of evidence for appellant's gross negligence involuntary manslaughter conviction, we shall consider "the inherent dangerousness of the act engaged in, as judged by a reasonable person . . . combined with environmental risk factors, which, together,

---

[13] "The term 'co-sleeping' is most commonly used to describe a situation where a caregiver sleeps on the 'same sleep surface as an infant[.]'" *Morrison*, 470 Md. at 95 n.2.

[14] On two occasions, the Court noted that the mother was not actually aware that co-sleeping could be deadly. *Morrison*, 460 Md. at 104, 115 (stating that "there was no suggestion that she was aware that co-sleeping could be deadly, even if risky[,]" and "the State did not introduce evidence that Ms. Morrison was aware of the risks of co-sleeping, or that a reasonable person under the circumstances would have appreciated those risks"). This seems to signal that, where factually applicable, a subjective standard could inform, if not supplant, the objective one. In other words, where the evidence shows that the person actually understood the danger of her conduct, the State may not need to show that an ordinarily prudent person would have appreciated the danger. In the instant case, because there is no evidence that appellant actually appreciated the dangerousness of his conduct, we rely on the objective test defined in the caselaw.

18

make the particular activity more or less 'likely at any moment to bring harm to another.'" *Thomas*, 464 Md. at 159 (quoting *Johnson*, 213 Md. at 533). Employing that standard, we conclude that appellant's conduct, under the totality of circumstances, was sufficient to establish gross negligence involuntary manslaughter.

Appellant placed Khafra, who was not an experienced construction worker, in a dangerous situation by paying Khafra $150 a day to dig tunnels underneath his home. The only way Khafra could contact appellant in case of an emergency was to send appellant messages through Google apps and hope appellant received them. Electricity to the tunnels was provided by various extension cords and power strips with an apparent history of failing, and in response to power outages, appellant would switch breakers and replace extension cords. When the power first went out on September 10, 2017, and Khafra believed he smelled smoke, his early morning messages went unnoticed for more than six hours until appellant finally woke up.

Compounding Khafra's helplessness while in the tunnels was the fact that appellant actively sought to conceal his home's location. The State produced evidence that appellant went to great lengths to conceal his address from both Khafra and Hart, requiring them to wear goggles or sunglasses that obstructed their vision while appellant drove them to his home. Although Khafra eventually learned that appellant's home was in Bethesda, appellant actively sought to hide this fact. This secrecy elevated the danger in that, although Khafra apparently had internet and phone service, not knowing his exact location

19

created an additional obstacle to him calling for and receiving emergency assistance.[15]

Contributing to the environmental risk factors here was the amount of debris and detritus in appellant's basement. These conditions elevated the danger by hampering Khafra's ability to escape in the event of an emergency. According to the State's Fire Cause investigator, escape from this particular fire would have been very difficult due to the debris in the basement. The investigator opined that individuals attempting to escape a fire instinctively get low to the ground to avoid the layer of hot air and gases caused by the fire. Doing so in appellant's basement, however, would have been "very, very difficult" "[b]ecause [Khafra would] have to crawl over all the debris, all the buckets and the bags of cement and all the other [debris in the basement]." Moreover, even if Khafra were able to navigate through the debris, Mr. Hart testified that the basement doors were typically locked, a situation that, if believed by the jury, would have further hampered Khafra's escape efforts.

Finally, appellant's conduct on the day of the fire, when coupled with the dangerous environmental factors listed above, demonstrated his wanton and reckless disregard for Khafra's life. When appellant saw Khafra's messages at approximately 9 a.m. regarding a power outage and the possible odor of smoke, appellant's only response was to tell Khafra that there had been a "pretty major electrical failure," and to manually switch power over to another breaker. When the carbon monoxide alarm began to beep that afternoon,

---

[15] Appellant used a virtual private network so that, had Khafra attempted to use his phone's location services while connected to appellant's network, it would have appeared to Khafra that he was in Virginia.

20

indicating another loss of power, appellant waited approximately twenty to thirty minutes before finally resetting the circuit breaker despite the fact that the previous electrical failure had left Khafra in "pitch black" darkness with no airflow. Despite the electrical failures, and Khafra's helplessness under the circumstances, at no point in time did appellant ask Khafra to leave the basement for precautionary reasons. In our view, the "environmental risk factors" and appellant's conduct related to those risk factors, taken together, sufficiently demonstrate the requisite wanton and reckless disregard for Khafra's life necessary to support a conviction for gross negligence involuntary manslaughter.

Although none of the Maryland cases cited above neatly align with the unique facts present here, our conclusion is bolstered by two out-of-state decisions: *Noakes v. Commonwealth*, 699 S.E.2d 284 (Va. 2010), and *People v. Luo*, 224 Cal. Rptr. 3d 526 (Cal. Ct. App. 2017).

In *Noakes*, the Supreme Court of Virginia was tasked with determining whether there was sufficient evidence to support Noakes's conviction for involuntary manslaughter. 669 S.E.3d at 286. There, Noakes, an in-home child-care provider, had been caring for Noah Colassaco for approximately three weeks. *Id*. For those three weeks, Noakes "had experienced difficulty in getting Noah to lie down and sleep during 'nap time.'" *Id*.

"Around noon on the day in question, Noakes put Noah and another toddler she was caring for in their cribs for an afternoon nap. The cribs were located in an upstairs, 'loft' bedroom that was only partially visible from Noakes' bedroom." *Id*. (footnote omitted). The cribs themselves, however, were not visible from Noakes's bedroom. *Id*. When Noakes left him, Noah was standing in his crib and crying. *Id*.

21

Approximately a half an hour later, when Noakes returned to check on Noah, he was still standing in his crib and crying. *Id.* We refer to the court's description of Noakes's efforts to get Noah to sleep:

> Knowing that when Noah stood in his crib, his chin was above the crib's sides, and also that Noah would fall asleep if he were lying or sitting in the crib instead of standing, Noakes decided to place a make-shift covering over the crib to prevent Noah from standing. After removing Noah from his crib, Noakes placed a thirty-three and one-quarter pound, collapsed "dog crate," which ran the length of the crib but was substantially narrower, on top of the crib. Noakes reasoned that the crate's weight would prevent Noah from standing up in the crib.

> Noakes tested the stability of her contraption by shaking the crib with the crate on top to determine if the crate could fall into the crib and injure Noah. Satisfied that the crate could not fall into the crib, Noakes removed the crate, put Noah back into the crib, and placed a fabric-covered piece of approximately one-inch thick cardboard on top of the crib. The cardboard was added, in part, to cushion the force of any impact between Noah's head and the crate if Noah attempted to stand. Although the cardboard would cover the entirety of the crib's top, Noakes positioned it so the cardboard extended out over the front of the crib, where Noah often stood, thus leaving a small "gap" in the rear between the crib's side and the cardboard. Noakes then placed the dog crate on top of the cardboard, toward the front side of the crib, where it covered a little more than one-half of the crib's width. Noakes examined the covering to ensure that Noah would not be able to reach into the dog crate and injure his fingers.

*Id.* at 286-87.

After observing Noah and detecting no problems, Noakes left the loft area. *Id.* at 287. Sometime before 1:00 p.m., however, Noakes returned when she heard a noise from the loft and observed Noah sitting in his crib with his face pressed against the crib's front mesh. *Id.* Noakes then placed a toy in front of the crib to obstruct Noah's view, believing that he would eventually get bored and finally go to sleep. *Id.* Noakes returned again at approximately 3:15 p.m. to wake another toddler from his nap, but did not check on Noah.

22

*Id*.  About forty-five minutes later, Noakes returned to wake Noah but found him unconscious.  *Id*.

> He was standing with his chin resting on the side of the crib, one or both of his hands gripping the crib's side, and his head and neck wedged between the cardboard and the crib.  His lips were blue and his skin was cold to Noakes' touch.  Noakes surmised that Noah had attempted to stand, had pushed up against the cardboard causing the dog crate to slide a few inches thereby creating a space between the covering on the top of the crib and the crib's wall.

*Id*.  Despite Noakes's efforts and those of emergency personnel, Noah was pronounced dead.  *Id*.  Noah died as a result of "[a]sphyxia due to mechanical compression of neck." *Id*.

Following a bench trial, Noakes was convicted of involuntary manslaughter.  *Id*. On appeal to Virginia's Supreme Court, Noakes argued that the evidence was insufficient to sustain her conviction as a matter of law because her actions did not constitute criminal negligence, and because she could not have anticipated Noah's unforeseeable acts.  *Id*. at 288.

At the outset, we note the similarities between Maryland's and Virginia's standards for gross negligence involuntary manslaughter.  Virginia law requires that "the lawful act must have been done in a way so grossly negligent and culpable as to indicate an indifference to consequences or an absence of decent regard for human life." *Id*. (quoting *Kirk v. Commonwealth*, 44 S.E.2d 409, 413 (Va. 1947)).  Applying this standard, the Supreme Court of Virginia upheld Noakes's conviction for involuntary manslaughter, concluding that her conduct demonstrated a reckless disregard for Noah's life:

23

Upon review of the evidence, we conclude that Noakes' conduct in placing cardboard and a thirty-three and one-quarter pound, collapsed dog crate atop Noah's crib and failing to visually check on him for about three hours was wanton and willful, "showing a reckless or indifferent disregard of [Noah's rights], under circumstances [that made] it not improbable that injury [would] be occasioned, and [Noakes] is charged with the knowledge of[] the probable result of [her] acts." Noakes knew that Noah would attempt to stand in his crib and also that when doing so, Noah's head and chin rose above the height of the crib's sides. While she obviously took steps to prevent the crate's falling upon Noah and his reaching into the crate, Noakes should have known that a toddler, used to standing but constrained against his will, might attempt to free himself, thereby dislodging the makeshift covering and sustaining serious injury. The measures that Noakes undertook to prevent the crate from falling upon Noah demonstrate her actual knowledge of the inherent danger of the contraption she placed atop the crib. And, because Noakes knew that she had placed Noah in an inherently dangerous situation that could cause serious injury, she certainly should not have left Noah unattended for approximately three hours.

*Id*. at 289 (internal citation omitted).

Noakes's actions, though well-meaning, were inherently dangerous. She created a make-shift apparatus designed to prevent Noah from standing up, but with the capacity to apply over thirty pounds of weight against any part of his body that managed to lift the cardboard. Additionally, Noakes left Noah, who was essentially helpless, unattended for three hours. Under these circumstances, the Court concluded that Noakes demonstrated a wanton and reckless disregard for Noah's life.

The other out-of-state case that provides useful guidance is *Luo*, 224 Cal. Rptr. 3d 526. There, "[a]fter an unsupported excavation at a construction site caved in and killed a worker, a jury convicted defendant Dan Luo of involuntary manslaughter" and other related crimes. *Id*. at 531. Luo, who was neither a licensed realtor nor a licensed general

24

contractor, worked as an assistant for Richard Liu, who was both a real estate agent and licensed general contractor. *Id.*

In April 2010, Liu sold a real estate parcel, and agreed to construct a home on the property. *Id.* Luo was tasked with overseeing construction and dealing with the property owner and contractors. *Id.* at 532. In January 2012, because Liu had failed to pay his contractor for work on the property, the workers walked off the jobsite. *Id.* at 532. "At that time, the hallway excavation [a deep cut made into a hill on the property] still had the 12-foot high, unsupported dirt wall with an overhanging ledge, and there were numerous unresolved issues with the construction." *Id.* Unable to find a licensed contractor to replace the one who had walked off the job, Luo instead hired a union carpenter. *Id.* The carpenter never considered himself responsible for the safety of the jobsite, and Luo "did not put in place any job safety plan nor did he meet with the workers to discuss safety." *Id.*

In late January 2012, a city inspector came to the jobsite and handed Luo a "Stop Work Notice" which explicitly stated: "DO NOT PROCEED[¶] with this job until the above has been approved for correction by the building and safety department." *Id.* Luo "did not tell any of the workers about the notice and he did not direct anyone to stop work. Instead, he told the workers that the city wanted benching cut into the hill above the wall. . . . [Luo] never sought approval from the city to continue the construction." *Id.* at 532-33. Two days after issuance of the Stop Work Notice, Luo "specifically instructed the workers to work in the excavation area." *Id.* at 533. The next morning, "the excavation wall collapsed," killing a worker. *Id.* Following his conviction for involuntary

25

manslaughter and other related charges, Luo appealed to the California Court of Appeal.

*Id.*

On appeal, Luo argued that there was insufficient evidence to support his conviction

for involuntary manslaughter. *Id.* In rejecting Luo's argument, the California appellate

court first identified its standard for gross negligence involuntary manslaughter:

> Criminal negligence is defined as conduct that is such a departure
> from what would be the conduct of an ordinarily prudent or careful [person]
> under the same circumstances as to be incompatible with a proper regard for
> human life, or, in other words, a disregard of human life or an indifference
> to [the] consequences.

*Id.* at 533-34 (internal quotation marks omitted) (quoting *People v. Penny*, 285 P.2d 926

(Cal. 1955)).[16]

Applying this standard, the California Court of Appeal readily concluded that the

evidence was sufficient to support Luo's conviction:

> The prosecution presented evidence that defendant was in a
> supervisory position at the construction site, took no action to enhance the
> safety of the workplace, violated several applicable safety regulations, did
> not inform the workers that he had been ordered by the city to stop work due
> to a dangerous condition, and directed the victim to work in the dangerous
> area even after receiving the Stop Work Notice. The evidence was sufficient
> for a rational jury to conclude that defendant committed involuntary
> manslaughter by performing a lawful act that might produce death, without
> due caution or circumspection.

*Id.* at 535.

We recognize that sufficiency of evidence cases in the gross negligence involuntary

manslaughter arena are inherently fact-specific, and, to that extent, their persuasiveness is

---

[16] We note that this standard resembles Maryland's standard for gross negligence
involuntary manslaughter.

limited. Nevertheless, both *Noakes* and *Luo* provide examples of analogous conduct that appellate courts found sufficiently demonstrated a reckless disregard for human life to support an involuntary manslaughter conviction. Although not an infant, Khafra, like Noah, was essentially trapped in an unsafe situation of the defendant's making—appellant created the tunnels just as Noakes created the crib apparatus. Similarly, both Noakes and appellant were solely responsible for their respective victims' safety—Noakes was the only adult close enough to respond to any emergency concerning Noah, and appellant was the only person who even knew where Khafra was while Khafra was underground digging in the tunnels. In short, both Noakes and appellant created unsafe conditions for their respective victims: Noakes created an apparatus designed to be heavier than anything Noah could lift, and placed it above his head; appellant invited Khafra to dig tunnels in a secret location beneath appellant's home where there were power outages, and where mounds of garbage and debris, and possibly locked doors, impeded escape in the event of an emergency.

Turning to *Luo*, we note that appellant, like Luo, was in a supervisory position at a "construction" site and disregarded the safety implications despite obvious danger warnings. Although we acknowledge that Luo disregarded a government-issued Stop Work Notice that instructed him to cease operations, appellant disregarded the significance of Khafra's precarious and dependent position in the tunnels, the occurrence of two electrical failures within a twenty-four-hour period, and the obstacles Khafra faced in the event of an emergency. In summary, although we recognize the fact-specific nature of *Noakes* and *Luo*, they support our conclusion that appellant's conduct was sufficient for a

27

jury to find him guilty of gross negligence involuntary manslaughter.

C. *The State Produced Sufficient Evidence to Establish Causation*

In addition to challenging whether his conduct demonstrated a wanton and reckless disregard for human life, appellant also challenges whether the evidence was sufficient to support the causation element of gross negligence involuntary manslaughter. Appellant correctly notes that "A causal connection between . . . gross negligence and death must exist to support a conviction[.]" *Thomas*, 464 Md. at 173 (quoting *Albrecht*, 336 Md. at 499). Specifically, "the defendant's gross negligence must be the proximate cause of the victim's death—meaning the (1) actual, but-for cause and (2) legal cause." *Id.* (citing *Jackson v. State*, 286 Md. 430, 442-43 (1979)).

Regarding actual causation,

> Maryland gross negligence manslaughter cases have evaluated the actual, or but-for, cause of a given result on only a few occasions. In one such case, the Court of Special Appeals determined that a mutual agreement to engage in grossly negligent conduct can be sufficient to find causation, even where the victim was, himself, engaged in the grossly negligent act.

*Id.* at 174-75. The Court of Appeals has stated that

> a defendant does not 'cease to be responsible for his otherwise criminal conduct because there were other conditions which contributed to the same result.' In [*Palmer v. State*, 223 Md. 341, 353 (1960)], we held a mother liable for gross negligence involuntary manslaughter when she failed to prevent her husband's savage beatings of her daughter. Significantly, the Court concluded that it was not necessary that the mother's grossly negligent conduct be the sole reason for her daughter's death. *See Palmer*, 223 Md. at 353, 164 A.2d 467. Ultimately, her unwillingness to aid her child, which was her duty, resulted in the child's death and she, too, could be convicted of involuntary manslaughter. Thus, we took a broader view of actual cause, implicitly recognizing that the grossly negligent conduct need only be the but-for cause of the death, and not an independently sufficient cause of it.

28

*Thomas*, 464 Md. at 175 (citation omitted).

In *Thomas*, the victim consumed heroin that he had purchased from Thomas. *Id*. at 176-77. In holding that selling four bags of heroin was sufficient evidence of but-for causation, the Court of Appeals stated, "There is no evidence in the record that [the victim] could have died without the heroin, and this is enough to find but-for causation." *Id*. at 178 (citing *United States v. Alvarado*, 816 F.3d 242, 244 (4th Cir. 2016)).

Applying but-for causation to the instant case, we readily conclude that there was sufficient evidence of actual causation. Appellant hired Khafra to dig tunnels below his basement. When a relatively minor fire broke out, the fact that appellant's basement was covered in debris and garbage hampered Khafra's ability to escape the fire. Although appellant did not intentionally set the fire, his disregard for safety, including his refusal to recognize the implications of two electrical failures on the day of the fire, satisfy actual causation. In short, but-for appellant arranging to have Khafra work in a dangerous environment, Khafra would not have died.

Having established actual causation, we now turn to legal causation. "The concept of legal causation 'is applicable in both criminal and tort law, and the analysis is parallel in many instances.' Moreover, it 'turns largely upon the **foreseeability** of the consequence of the defendant's' conduct." *Id*. (emphasis in original) (internal citations omitted) (first quoting *Paroline v. United States*, 572 U.S. 434, 444 (2014); and then quoting *Palmer*, 223 Md. at 352). The State need not show that the ultimate harm was actually foreseen; "[i]t is sufficient that the ultimate harm is one which a reasonable [person] would foresee as being reasonably related to the acts of the defendant." *Id*. (quoting *Jackson*, 286 Md. at 441).

29

The facts in this case are sufficient to support a finding that appellant's conduct was the legal cause of Khafra's death. Although the evidence demonstrated that appellant could not have observed the latent defect in the electrical outlet that ultimately caused the fatal fire, two separate electrical failures, one of which appellant himself described as "major," occurred the day Khafra died. Additionally, the hoarder conditions in appellant's home dangerously hampered Khafra's ability to escape in the event of a fire emergency. Based on these facts, it was foreseeable that a fire might occur in the basement, and if it did, Khafra's ability to safely escape would be severely restricted. Accordingly, the evidence sufficiently demonstrated legal causation.

In sum, we hold that the evidence was sufficient to prove all elements of gross negligence involuntary manslaughter, and affirm appellant's conviction for that crime. We next turn to whether this evidence rises to the level of an extreme indifference to human life—the evidentiary standard for depraved heart murder.

D. *Depraved Heart Murder*

In *Criminal Homicide Law*, Judge Moylan presciently anticipated the challenge we now face:

> The *mens rea* of depraved-heart murder is described:
>> that the defendant, conscious of such risk, acted with extreme disregard of the life-endangering consequences.
>
> The *mens rea* of gross negligence manslaughter is described:
>> that the defendant, conscious of the risk, acted in a grossly negligent manner, that is, in a manner that created a high degree of risk to human life.
>
> It is hard to drive a wedge between those two. The problem, not yet arisen, will be excruciatingly difficult when a trial court, confronted with a

30

motion for a judgment of acquittal, or an appellate court, confronted with a question of the legal sufficiency of the evidence to support a conviction, is called upon to explain in intelligible terms how the State has successfully met its burden of production as to gross negligence manslaughter but has failed to meet its burden of production as to depraved-heart murder. What, as a matter of law, is the element that separates murder from manslaughter?

Judge Charles E. Moylan, *Criminal Homicide Law* § 12.5, at 228 (2002).

To answer Judge Moylan's question, we look to *Simpkins v. State*, 88 Md. App. 607 (1991), *cert. denied*, 328 Md. 94 (1992), which provides useful guidance for determining whether grossly negligent conduct rises to the level of murder. There, following a bench trial, a mother and father were convicted of second-degree depraved heart murder for the starvation, "or, as the medical examiner testified, malnutrition and dehydration[,]" of their two-year-old daughter Brandy. *Id.* at 608, 611. The facts showed that "Brandy lived with her parents and her four[-]year-old sister, Heather. A houseguest, John Monte, had been living with the family for just under two weeks." *Id.* at 609. Although Mr. Monte normally slept on a mat in Brandy's room, "for the two nights prior to her death he had slept downstairs." *Id.* After realizing that he had not seen Brandy in several days, Mr. Monte went to her bedroom and discovered that she was not moving. *Id.*

According to the medical examiner, Brandy died of malnutrition and dehydration as she "had not been given food or drink for three to five days." *Id.* Brandy was discovered wearing a diaper with approximately three-quarters of a pound of fecal matter, and it appeared her diaper had not been changed in four to six days. *Id.* Apparently, "death had occurred more than 24 hours before its discovery." *Id.* Although Brandy starved to death,

31

"it was not because of [her parents'] inability to provide food. Their kitchen refrigerator was crammed full of food, and they and Heather apparently ate quite well." *Id*. at 610.

On appeal, the parents challenged their convictions, arguing that the State failed to prove the malice element of depraved heart murder. *Id*. at 611. We observed that "[m]alice is the indispensable ingredient of murder; by its presence, homicide is murder; in its absence, homicide is manslaughter." *Id*. (quoting *Blackwell v. State*, 34 Md. App. 547, 552, *cert. denied* 280 Md. 728 (1997)). Nevertheless, we noted that malice may be inferred from "the intent to do an act under circumstances manifesting extreme indifference to the value of human life (depraved heart)[.]" *Id*. (quoting *Ross v. State*, 308 Md. 337, 340 (1987)). At the parents' trial, the prosecutor proceeded on the depraved heart murder theory, "and it was upon that theory that the convictions rested." *Id*.

In analyzing whether the evidence was sufficient to support the parents' convictions for depraved heart murder, then Chief Judge Wilner noted that

> A depraved heart murder is often described as a wanton and wilful killing. The term 'depraved heart' means something more than conduct amounting to a high or unreasonable risk to human life. The perpetrator must [or reasonably should] realize the risk his behavior has created to the extent that his conduct may be termed wilful. Moreover, the conduct must contain an element of viciousness or contemptuous disregard for the value of human life which conduct characterizes that behavior as wanton.

*Id*. at 611-12 (quoting *Robinson*, 307 Md. at 745). The Court recognized that, although depraved heart murder cases typically involved affirmative acts, "'depraved heart' murder has also been found in cases of malicious omission[.]" *Id*. at 612.

Chief Judge Wilner proceeded to trace the history of depraved heart murder cases involving child neglect from English common law through the present, including decisions

32

from other state courts. *Id*. at 612-20. Extracting a universal principle from the cases, he stated,

> Most of these cases—English and American—tend to be fact-specific. It is evident from all of them that mere neglect, despite its awful consequence, is not enough to establish malice and thus to support a conviction of murder. We believe, however, that, by applying the rules enunciated in *Robinson v. State*, *supra*, 307 Md. 738, 517 A.2d 94, the court's finding of malice in this case is supported by the evidence. Where a young child, incapable of self-help, is knowingly, deliberately, and unnecessarily placed in confinement and left alone for up to five days without food, drink, or attention and death ensues from that lack, malice may be inferred. *A rational trier of fact could reasonably find that death is at least a likely, if not a certain, consequence of such conduct, that any normal adult would understand and appreciate the likelihood of that consequence, and that the conduct is therefore willful and wanton, manifesting "viciousness or contemptuous disregard for the value of human life*[.]"

*Id*. at 620 (emphasis added) (quoting R. Gilbert & C. Moylan, *Maryland Criminal Law: Practice and Procedure* § 1.6-3 21 (1983)). We distill an essential component of depraved heart murder: the negligent conduct must be reasonably likely, if not certain, to cause death, for the evidence to sufficiently support the "malice" element required for depraved heart murder.[17] Because leaving a two-year-old alone for up to five days without food or water is reasonably likely, if not certain, to cause death, the Court found the evidence sufficient to support the parents' convictions for depraved heart murder. *Id*. at 620-21.

---

[17] We note that malice is similarly inferred based on the reasonable likelihood of death in other murder contexts. For example, second-degree murder of the intent to cause grievous bodily harm variety requires the intent "to cause such severe harm that death would be *the* likely result, not merely a possible result." *Thornton v. State*, 397 Md. 704, 730 (2007). Similarly, in the felony murder context, "[I]f the felonious conduct, under all of the circumstances, *made death a foreseeable consequence*, it is reasonable for the law to infer from the commission of the felony under those circumstances the malice that qualifies the homicide as murder." *State v. Jones*, 451 Md. 680, 699 (2017) (emphasis added) (quoting *Fisher v. State*, 367 Md. 218, 262 (2001)).

Although other opinions affirming convictions for depraved heart murder have not explicitly referenced this "likelihood or certainty of death" test, application of this test would support the depraved heart murder convictions affirmed in those cases. *See Robinson*, 307 Md. at 743 (allowing prosecution to proceed on depraved heart murder charge where evidence showed that defendant specifically lacked the intent to kill, but did intend to assault with intent to disable by shooting victim during an altercation); *In re Eric F.*, 116 Md. App. at 521-22 (holding that evidence was sufficient to support conviction for second-degree depraved heart murder where teenage defendant left teenage victim, who was severely intoxicated, outside in freezing weather and knew that "if [he did not] go back and get her she [was] probably going to freeze to death"); *Alston*, 101 Md. App. at 58 (upholding conviction for depraved heart murder where ten men engaged in an extended gunfight "on an urban street in a residential neighborhood" and the evidence revealed that various persons "were still sitting out on the front steps of rowhouses" when the shooting started).

Applying the "likelihood or certainty of death" test to the instant case, we conclude that appellant's conduct, viewed in conjunction with the surrounding circumstances, does not satisfy the evidentiary standard required for depraved heart murder. Although Khafra dug tunnels underneath appellant's home, the State did not present evidence that the tunnels themselves were structurally unsafe, a point the State conceded in rebuttal argument. Thus, Khafra's presence in the tunnels in and of itself was not likely to cause death. To be sure, appellant's basement was cluttered with trash and detritus, but these conditions were not inherently dangerous in that they posed an imminent risk of death to Khafra. Rather, the

34

hoarding conditions exacerbated any potential danger because, in an emergency, Khafra's escape path would be severely restricted. Nor was appellant's use of multiple electrical extension cords, despite their apparent history of failing, reasonably likely to cause death. Indeed, other individuals, including Khafra, worked in the tunnels without incident. Finally, appellant's conduct itself did not demonstrate an extreme disregard for human life *reasonably likely to cause death*.

To be sure, appellant intentionally concealed the tunnels' location from Khafra, and apathetically responded to electrical failures on the day of the fire, but we cannot conclude that appellant realized—or reasonably should have realized—that his conduct was "likely, if not certain" to cause death. *Simpkins*, 88 Md. App. at 611-12. Accordingly, appellant's conduct falls short of the willfulness necessary to satisfy the malice element of depraved heart murder. *Id*. at 611. Leaving a two-year-old child unattended for up to five days without food or water shows an extreme disregard for human life that is reasonably likely, if not certain, to cause the child's death. *Id*. at 620. Intentionally leaving a severely intoxicated teenager unattended in freezing conditions demonstrates an extreme disregard for human life that is reasonably likely, if not certain, to cause death. *In re Eric F*., 116 Md. App. 521. In our view, hiring someone to dig tunnels underneath a hoarder's home may demonstrate a reckless disregard for human life, but it is not the type of conduct that is likely, if not certain, to cause death, and thus does not rise to the level of opprobrious conduct that depraved heart murder proscribes—conduct that is so extreme in its disregard of human life that it may be deemed willful. Accordingly, we hold that the evidence is insufficient to support appellant's conviction for depraved heart murder.

E. *The Jury's Finding that Appellant's Conduct was Sufficiently Extreme to Support a Depraved Heart Murder Conviction Inherently Supports Appellant's Conviction for Gross Negligence Involuntary Manslaughter*

We address a final point on this subject that is unique to this case. The verdict sheet did not differentiate between the two theories of involuntary manslaughter presented to the jury here: gross negligence, and failure to perform a legal duty.[18] Rather, the jury simply returned a general verdict of guilty as to involuntary manslaughter. Despite the court's decision not to separately identify both modalities on the verdict sheet, on this record— where the jury convicted appellant of second-degree depraved heart murder—we are able to affirm appellant's conviction for gross negligence involuntary manslaughter without deciding whether the evidence was sufficient to support failure to perform a legal duty involuntary manslaughter. We explain.

It is well-settled in Maryland that, where the evidence is insufficient to support a conviction for a greater offense, an appellate court may reverse that conviction, but still affirm a conviction for a lesser included offense. In *Brooks v. State*, 314 Md. 585, 586-87 (1989), the State charged Brooks with multiple offenses, including robbery with a dangerous or deadly weapon, and simple or common law robbery. The jury convicted Brooks of armed robbery, but pursuant to the trial court's instructions, did not return a verdict on the common law robbery charge. *Id*. at 587 n.2. Because he performed the robbery with a toy gun, the Court of Appeals held that the evidence was insufficient to

---

[18] As noted above, there are three separate theories of involuntary manslaughter: unlawful act, gross negligence, and failure to perform a legal duty. *Thomas*, 464 Md. at 152.

36

support Brooks's conviction for armed robbery. *Id*. at 600-01. Rather than remand for a new trial, however, the Court of Appeals simply "direct[ed] that the judgment in the trial court be vacated, that a verdict of guilty of robbery be entered, and that Brooks then be sentenced on the robbery conviction." *Id*. at 601. In doing so, the Court noted that, "when there is insufficient evidence to convict of a greater offense, [an] appellate court may reverse [the] conviction and enter judgment on a lesser-included offense." *Id*. (citing *United States v. Dickinson*, 706 F.2d 88, 92-93 (2d Cir. 1983)). Indeed, in certain circumstances, an appellate court may reverse a conviction for a greater offense, but direct a judgment of conviction for a lesser-included offense, even where the lesser offense is uncharged. *See Hobby v. State*, 436 Md. 526, 530, 553-54 (2014) (vacating conviction for theft of property valued in excess of $100,000, but directing trial court to enter a guilty verdict for theft of property having a value of at least $10,000, but less than $100,000, despite that crime never being specifically charged).

As noted above, the gross negligence theory of involuntary manslaughter is simply a less culpable form of depraved heart murder. *Thomas*, 464 Md. at 173 n.20. By convicting appellant of second-degree depraved heart murder, the jury found that appellant demonstrated an "extreme disregard for human life." Thus, the jury necessarily found that appellant's conduct satisfied the lesser "reckless disregard for human life" required for gross negligence involuntary manslaughter. *See Pagotto*, 127 Md. App. at 277. Although we have determined that the evidence was insufficient to support a conviction for the greater offense, we nevertheless shall affirm appellant's conviction for the lesser offense—gross negligence involuntary manslaughter. *Brooks*, 314 Md. at 601.

37

Appellant challenges the notion that we can rely on the conviction for second-degree depraved heart murder to sustain the conviction for gross negligence involuntary manslaughter. He argues that, during closing argument, the State blurred the line between failure to perform a legal duty involuntary manslaughter and extreme negligence second-degree depraved heart murder. Because of this allegedly improper closing argument, appellant claims that the jury may have found him guilty of second-degree depraved heart murder based on a theory of failure to perform a legal duty. Under appellant's theory, it would be inappropriate to affirm the conviction for gross negligence involuntary manslaughter based on the jury's conviction for second-degree depraved heart murder.[19]

---

[19] We reject appellant's characterization of the State's closing argument as asserting that appellant's failure to perform a legal duty should be considered for both his involuntary manslaughter and depraved heart murder counts. We acknowledge that on a single occasion, the prosecutor referenced the employer/employee relationship (failure to perform a legal duty) when telling the jury, "These are all the things that the State believes show . . . that the defendant engaged in, in order to be liable for depraved heart murder or involuntary manslaughter." Nevertheless, the thrust of the prosecutor's closing argument clearly established a line of demarcation between failure to perform a legal duty involuntary manslaughter and extreme negligence second-degree depraved heart murder. After reminding the jury that second-degree depraved heart murder required them to find an extreme disregard for human life, the State clearly explained that *only gross negligence involuntary manslaughter and second-degree depraved heart murder were similar*, stating:

> The main difference between [second-degree depraved heart murder] and one of the forms of involuntary manslaughter is the word very, very high degree of risk and involuntary manslaughter is high degree of risk, and the word extreme. Extreme disregard and involuntary manslaughter reckless disregard. *So it's a matter of degrees between the depraved heart murder and one of those ways you can get to involuntary manslaughter.*

(Emphasis added).

The fatal flaw in appellant's argument is that the trial court instructed the jury regarding second-degree depraved heart murder as the most egregious form of criminal negligence. The court instructed the jury pursuant to Maryland Criminal Pattern Jury Instruction § 4:17.8:

> The defendant is charged with a crime of depraved heart murder, this charge includes second[-]degree depraved heart murder and involuntary manslaughter. Second[-]degree depraved heart murder is the killing of another person while acting with an extreme disregard for human life.
>
> In order to convict the defendant of second[-]degree depraved heart murder the State must prove that the defendant caused the death of Askia Khafra, that defendant's conduct created a very high degree of risk to the life of Askia Khafra and that the defendant conscious of such risk acted with extreme disregard of the life endangering consequences.

The court's instruction tracked the theory of second-degree depraved heart murder as an extreme disregard for human life. Absent in this instruction is any reference to the "failure to perform a legal duty" modality of involuntary manslaughter, which, at a minimum would require a definition of "legal duty" as an element of the offense. Although we acknowledge the possibility that failure to perform a legal duty involuntary manslaughter could, in a proper case, elevate to depraved heart murder, the jury here was never provided with such an instruction.[20] Accordingly, although we reverse the conviction for second-degree depraved heart murder, we affirm the conviction for involuntary manslaughter under a theory of gross negligence.

---

[20] *See* n.10, *supra*.

II.  JURY INSTRUCTIONS

Appellant next argues that we must vacate his convictions due to trial court error regarding jury instructions.  Specifically, appellant raises two[21] issues regarding the jury instructions provided: 1) the trial court failed to instruct the jury regarding assumption of the risk and 2) the trial court failed to instruct on the element of causation.  We reject each argument in turn.

We have stated the following regarding the standard of review of a trial court's jury instructions:

> We review a trial court's decision to give or refuse a jury instruction under the abuse of discretion standard.  Upon the request of any party, a trial court is required to "instruct the jury as to the applicable law and extent to which the instructions are binding."  "[I]n evaluating the propriety of a trial court's refusal to give a requested instruction, we must determine whether the requested instruction was a correct statement of the law; whether it was applicable under the facts of the case; and whether it was fairly covered in the instructions actually given."

*Nicholson v. State*, 239 Md. App. 228, 239 (2018) (internal citations omitted).  This deferential standard shall guide our consideration of the instructions provided.

A. *Instruction Regarding Assumption of Risk and Knowledge of Conditions by Victim*

Appellant alleges that the court should have given jury instructions regarding

---

[21] Although he raises three additional arguments in his brief regarding erroneous jury instructions concerning the failure to perform a legal duty modality of involuntary manslaughter, we need not address those arguments because, as explained above, we are able to conclude that the jury found all of the requisite elements of gross negligence involuntary manslaughter.  Because the jury convicted appellant of a sole count for involuntary manslaughter, which we affirm on the basis of gross negligence, we need not determine the validity of the other potential theory for involuntary manslaughter (failure to perform a legal duty).

40

"assumption of the risk" and "knowledge of the conditions by [the victim]." We summarily reject appellant's argument because the Court of Appeals has made clear that the victim's negligence is irrelevant in determining the guilt of a defendant in this context. In *Duren*, the Court stated:

> If the appellant was guilty of gross negligence, he cannot excuse his conduct and escape the consequences by showing that the deceased was guilty of contributory negligence. Necessarily, the criminal negligence must have produced the death if the accused is to be guilty of manslaughter. If, however, that criminal negligence is found to be a direct and proximate cause of the death, the guilty one is not relieved from responsibility by the fact that the negligence of the other may have concurred in producing the result.

203 Md. at 593; *see also Thomas*, 464 Md. at 179 ("contributory negligence is not a defense to involuntary manslaughter"). The trial court properly rejected appellant's proposed instructions concerning "assumption of the risk" and the victim's "knowledge of the conditions."

B. *Instruction Regarding Causation*

Appellant further argues that the trial court erred by failing to give a jury instruction regarding causation. The court provided the pattern jury instructions for depraved heart murder and gross negligence involuntary manslaughter, neither of which specifically define "causation." Notably, the Court of Appeals recently placed its imprimatur on the pattern instruction for gross negligence involuntary manslaughter regarding causation. *Thomas*, 464 Md. at 173 n.20 (noting that the pattern instructions correctly recognize the different causation standards required for gross negligence involuntary manslaughter and unlawful act involuntary manslaughter). We reiterate the accepted principle that "a trial court is strongly encouraged to use the pattern jury instructions." *Johnson v. State*, 223

41

Md. App. 128, 152 (2015). In light of *Thomas*, we see no error in the court's use of the pattern jury instructions and its refusal to give a separate causation instruction.

III.    PROSECUTOR'S CLOSING AND REBUTTAL ARGUMENTS

Appellant's third claim of error stems from alleged improper prosecutorial remarks during closing and rebuttal argument. According to appellant, during closing and rebuttal, the prosecutor: 1) violated the "golden rule," 2) provided inappropriate examples of reckless behavior by alluding to the acts of driving blindfolded down the highway and an employer locking factory workers inside a building, 3) improperly commented on Maryland law, 4) provided an inappropriate example of a drunk driver killing a passenger, and 5) wrongfully compared Khafra to a domestic violence victim. He independently asserts that the cumulative effect of these errors warrants reversal.

Regarding closing arguments, the Court of Appeals has stated, "we grant attorneys, including prosecutors, a great deal of leeway in making closing arguments. 'The prosecutor is allowed liberal freedom of speech and may make any comment that is warranted by the evidence or inferences reasonably drawn therefrom.'" *Whack v. State*, 433 Md. 728, 742 (2013) (quoting *Spain v. State*, 386 Md. 145, 152 (2005)). This leeway, however, is not unlimited. *Id.*

> Whether a reversal of a conviction based upon improper closing argument is warranted "depends on the facts in each case." Generally, the trial court is in the best position to determine whether counsel has stepped outside the bounds of propriety during closing argument. "As such, we do not disturb the trial judge's judgment in that regard unless there is a clear abuse of discretion that likely injured a party." In deciding whether there was an abuse of discretion, we examine whether the jury was actually or likely misled or otherwise "influenced to the prejudice of the accused" by the State's

42

comments. Only where there has been "prejudice to the defendant" will we reverse a conviction.

*Id.* at 742-43 (internal citations omitted). Further, and particularly relevant in this case, "Where an objection to opening or closing argument is *sustained*, we agree that there is nothing for this Court to review unless a request for specific relief, such as a motion for a mistrial, to strike, or for further cautionary instruction is made." *Hairston v. State*, 68 Md. App. 230, 236 (1986) (citing *Blandon v. State*, 60 Md. App. 582, 586 (1984)). With these standards in mind, we turn to appellant's allegations of error.

A. *The "Golden Rule" Argument*

Appellant's first allegation concerns an alleged "golden rule" argument. "A 'golden rule' argument is one in which a litigant asks the jury to place themselves in the shoes of the victim, or in which an attorney appeals to the jury's own interests[.]" *Lee v. State*, 405 Md. 148, 171 (2008) (internal citations omitted). In his brief, appellant writes, "Improperly appealing to abandonment and objectivity, the prosecutor told the jury what it and the jury would do [if] similarly situated to Khafra." First, we disagree that the prosecutor made a "golden rule" argument during closing argument. But even if the prosecutor's comment could be construed as a "golden rule" argument, appellant's counsel objected, and the court instructed the State to rephrase her argument, which appellant's counsel apparently accepted. Accordingly, we perceive no reversible error.

*Lawson v. State* presents an example of a "golden rule" argument. 389 Md. 570 (2005). There, the State accused Lawson of sexually abusing a minor child. *Id.* at 575-77. During closing argument, the prosecutor told the jury:

I want you to *put yourself in the shoes* if you have an eight-year-old niece, seven-year-old niece, or you have an eight-year-old daughter, seven-year-old daughter, a cousin, a close family friend, and this child comes to you and says that someone that you know sexually molested them. What would go through your minds?

Well, I would urge you to think about certain things. One, motive, What is the motive here? Have you heard any motive? Did the defense give you a motive as to why [the victim] would be lying?[] [Emphasis added].

*Id*. at 579. The *Lawson* Court noted that, "When a jury is asked to place themselves in the shoes of the victim, the attorney improperly appeals to their prejudices and asks them to abandon their neutral fact[-]finding role." *Id*. at 594.

Appellant here complains that the State made a "golden rule" argument during the following colloquy:

| [THE STATE]: | And once again, I went to try and unplug the faulty power strip and it started working again, how about that? Is that a breach of his duty as an employer, I'll just unplug and plug it back in; but why I put it here is even [sic] the defendant is in charge of doing things like oh there's a faulty power strip, it's the defendant who fixes things, it's the defendant who fixes the circuit breaker and that is normal, those things are normal, the food thing is over the top but when you're in someone else's house, *you and I we would never go if the lights went out if the host is there we would never go to the breaker panel and start* -- |
|---|---|
| [APPELLANT'S COUNSEL]: | Objection. |
| THE COURT: | Why don't you approach? |

(Bench conference follows:)

| | |
|---|---|
| THE COURT: | Okay, basis? |
| [APPELLANT'S COUNSEL]: | Golden rule, you don't ask the jury to put themselves in your position or in their position with respect to matters that are pertinent to the case. |
| THE COURT: | Okay. |
| [THE STATE]: | I'll rephrase. |
| THE COURT: | Yes, and I think that was intended, I think it's just in argument.  All right. |
| [APPELLANT'S COUNSEL]: | Okay. |
| (Bench conference concluded.) | |
| THE COURT: | Rephrase it. |
| [THE STATE]: | So I will rephrase.  A person at a friend's house would never venture to the breaker panel to start flipping breakers to figure out the electricity.  That is normal.  That is something that is in the control and it's expected to be in the control of the homeowner and especially in the control of the employer. |

(Emphasis added).

In our view, the prosecutor's statement here did not constitute a "golden rule" argument.  Whereas in *Lawson* the prosecutor told the jury to imagine their own family member being the victim of a sexual assault, here the prosecutor seemed to be simply commenting on social mores: a guest in a home does not typically tamper with the circuit breaker.  In this sense, the State did not ask the jury to put itself in the place of the victim;

45

the State simply relayed an understood social norm by using the first and second-person perspectives.

Even if this statement could somehow be construed as a "golden rule" argument, appellant's argument would still fail. After appellant objected and informed the court that the State had made a "golden rule" argument, the State rephrased its argument, clarifying that the comment was more about "normal" behavior than about putting the jury in the shoes of the victim. By accepting the State's rephrasing and not requesting any further action by the court, appellant waived any complaint concerning the State's purported "golden rule" argument. *Hairston*, 68 Md. App. at 236.

B. *Examples of Driving Blindfolded and Locking Factory Workers in a Building*

Appellant next takes issue with the trial court's treatment of two examples of reckless behavior the State made in closing argument. According to appellant's brief, the examples not only assumed facts not in evidence, but asked the jury to draw improper analogies that were inaccurate portrayals of gross negligence manslaughter and depraved heart murder. As we shall explain, appellant failed to timely object to one of the examples. Additionally, the court sustained appellant's objection regarding the locked-in factory workers and issued an instruction, at appellant's request, regarding references made in that example. Accordingly, these arguments are waived. We explain.

The State proffered the examples at issue during the following colloquy:

| [THE STATE]: | The State does not need to prove that, there's no arson charge, we don't need to prove an intent. So here's an example let's say there's two guys who are, let's assume they're young, immature and |
|---|---|

46

stupid and highly reckless and [they] say wouldn't it be really fun and funny to drive down the highway blindfolded and see how well we could do, because I think I know this highway so well I think I know the exits and I'll [bet] you on it.

I'll [bet] you I'll get to the exit at the right time and so one of them is blind folded and they drive down the highway and they're on 270 and they crash and kill a family in another car. They, the driver is responsible for the death of that family even though let's say afterwards he feels terrible, he feels stupid and he's going to carry it with him the rest of his life.

There's criminal liability for crimes you don't intend and it's up to you to decide was that a very high degree of recklessness or just a high degree. It's up to you to decide those things. Was it very high or high? Was it extreme disregard for human life or reckless disregard? That's your job. So there's an example of what could either be depraved heart murder or involuntary manslaughter. So then what's this employer/employee relationship one that could get you to involuntary manslaughter?

Well, so, let's say there are workers in a factory and they're a bunch of smokers and the employers are sick and tired of them cutting out when they should be working, cutting out the doors and smoking. So they decide to lock all the doors so that no one can take an unapproved smoke break and then there's a fire and everyone's trapped inside because all the doors are locked. There is a breach of the employer/employee relationship because you have to keep a

47

workplace safe and safety in a workplace requires a fire escape and those people weren't allowed or weren't able to get out due to the employer.

[APPELLANT'S COUNSEL]: Your Honor, I object.

THE COURT: Approach.

(Bench conference follows:)

[APPELLANT'S COUNSEL]: Counsel cannot argue that a fire escape is required in a workplace. That's saying that, she's arguing the law. The Court has precluded us from having specific examples to this jury or guidance with this jury as to what a safe work environment is. She has told them that you have to have a fire escape at the workplace. There's no, nothing in this record that says that. I also object to these examples.

She's giving basically unlawful act manslaughter examples. I don't think that giving examples, factual examples of other incidences is appropriate but in particular if it goes to trying to indicate what the standards are for a safe work place, that's what the Court has precluded me from doing and I object to the State doing it.

THE COURT: Okay, so as to the fire escape, I sustain that objection as to the fire escape. As to whether or not there's any escape it's just argument so I'll allow that but as to require a fire escape, sustained okay.

[THE STATE]: I'll make it clear that I'm arguing that.

[APPELLANT'S COUNSEL]: *Well, I want the Court to sustain the objection in front of the jury and tell them*

48

|  |  | *to disregard any reference to what is* |
|  |  | *required with respect to a fire escape.* |

THE COURT:                    Okay.

(Bench conference concluded.)

THE COURT:                    *Sustained as to the use of the term and any*
                              *requirement as to fire escapes.*

(Emphasis added).

We first note that appellant failed to articulate any complaint to the trial court regarding the driving blindfolded example. Aside from stating, "I also object to these examples[,]" appellant never specifically disputed the propriety of the driving blindfolded example, thereby depriving the court of the opportunity to rule on that issue. Any argument pertaining to this example is waived. *See* Maryland Rule 8-131(a).

Turning to the example of the factory workers, we note that the court sustained appellant's objection, and advised the jury that appellant's objection was "Sustained as to the use of the term and any requirement as to fire escapes." As noted above, "Where an objection to opening or closing argument is *sustained*, we agree that there is nothing for this Court to review unless a request for specific relief, such as a motion for a mistrial, to strike, or for further cautionary instruction is made." *Hairston*, 68 Md. App. at 236. Here, consistent with appellant's request, the court sustained the objection and informed the jury that the State's comments regarding fire escapes were stricken. Appellant did not further object to the court's actions or request any additional relief. Accordingly, there is nothing for us to review. *Id.*

C. *Prosecutor's Allegedly Improper Comment on Maryland Law*

Appellant next takes issue with the prosecutor's remark in closing that, "[T]he law says in Maryland, it's okay for two people to be jointly reckless and still have liability on the one that doesn't die." The totality of appellant's appellate argument on this issue consists of two sentences:

> Beckwitt's counsel objected and moved to strike, and the trial court sustained the objection and struck "[a]s to, as to the case law," but not as to the remaining phrase. The State persisted with more improprieties.

(Internal citations omitted). Again, we reject appellant's argument because the objection was sustained, leaving nothing for us to review.

During the State's rebuttal, the following occurred:

| | |
|---|---|
| [THE STATE]: | Because the law says in Maryland, it's okay for two people to be jointly reckless and still have liability on the one that doesn't die. |
| [APPELLANT'S COUNSEL]: | Objection. |
| THE COURT: | Sustained. |
| [APPELLANT'S COUNSEL]: | Move to strike. |
| THE COURT: | As to, as to the case law. Correct. Sustained. Stricken. |

In our view, the trial court likely assumed that appellant was satisfied with its ruling absent any further request for relief. Under *Hairston*, "there is nothing for this Court to review." 68 Md. App. at 236. We further note that appellant has not cited any caselaw to support his claim that the prosecutor's remark was substantively incorrect.

50

D. *Drunk Driving Example*

Appellant's fourth argument concerns the following exchange that occurred during the State's rebuttal argument:

| | |
|---|---|
| [THE STATE]: | You know this, let me give you some examples. A drunk driver, let's say there's two people at a bar, two friends at a bar. They're drinking together. They're drinking together excessively. And someone is way -- there's one person who's way excessive. The friend of the person who went way excessive drinking really needs a ride home and it's raining out and for whatever reason needs to get home right away. |
| | So, they make a stupid decision to get in a car and accept a ride home from the way drunk driver. And the drunk driver crashes as a result of being drunk and kills the person who made the stupid decision. We still hold the drunk driver responsible. Why? Because it's not about who the victim is and whether they made a stupid decision. It's not about who the defendant is and whether he's different or not. None of that is what it's about. It's about the conduct. Society has an interest in stopping that conduct. |
| [APPELLANT'S COUNSEL]: | Objection. |
| THE COURT: | Sustained. |
| [APPELLANT'S COUNSEL]: | Move to strike. |
| THE COURT: | Move to strike. |

Here, the court clearly sustained appellant's objection. Although we acknowledge that the court's response to appellant's motion to strike was imprecise, we are persuaded

that the jury reasonably understood that the court granted appellant's motion to strike. In any event, appellant sought no further relief. Like appellant's previous arguments, he failed to preserve this issue for our review. *Hairston*, 68 Md. App. at 236.

E. *Domestic Violence Example*

Appellant's fifth allegation of closing argument error concerns the State's comparison of Khafra to a domestic violence victim. During the State's rebuttal, the following occurred:

| | |
|---|---|
| [THE STATE]: | It's about the conduct. It is not about who the people are. And I'll give you another example because the Defense went on about how Askia wasn't dependent. He was making a choice for sure. But he was making a choice to be dependent. To be dependent. And that was his choice, but it doesn't change the fact that when he was there, he was dependent. And he chose to go there, but that doesn't mean we forget about what the defendant's conduct was. |
| | And I'll give you an example. Think about domestic violence. How many times do you see the victim returning? Returning to the person abusing them? They're independent. They're adults. And we know domestic violence has affected people at all income levels. They may be independent financially. Why do they still go back? It's, it's a complex answer. Why did Askia go? It's a complex answer. For when that victim -- |
| [APPELLANT'S COUNSEL]: | Objection, Your Honor. |
| THE COURT: | Overruled. |

52

| | |
|---|---|
| [THE STATE]: | When that victim returns to the house and let's say in a violent rage the abuser is throwing things around and the victim gets killed, it's the conduct -- |
| [APPELLANT'S COUNSEL]: | Your Honor, I object to this. Can we approach? |
| THE COURT: | Sure. |

(Bench conference follows:)

| | |
|---|---|
| [APPELLANT'S COUNSEL]: | You know, I was precluded from going into issues such as assumption of risk and contributory negligence and all of this kind of stuff and now counsel is going exactly into that area and talking about victims not being held accountable for assuming the risk or whatever this argument is. And I think it is improper to be making these comparisons in this case for those reasons. |
| THE COURT: | Okay, well I -- it's, it's a little bit of a fair comment because we went into issues of him making independent decisions and going back and doing this and that. But I'm going to suggest that you move on. |
| [APPELLANT'S COUNSEL]: | Well, Your Honor -- |
| [THE STATE]: | I'm doing it because he said -- he was saying there was no dependence because he was making independent decisions. |
| THE COURT: | I understand that. I understand that. But I think we've gotten a little far afield. So, move on. |
| [APPELLANT'S COUNSEL]: | And, Your Honor, with respect to some of these arguments that counsel has made regarding, excuse me, society has an interest in preventing misconduct -- |

53

| | |
|---|---|
| THE COURT: | And that was sustained. It was stricken. |
| [APPELLANT'S COUNSEL]: | I understand. But I'd ask the Court to issue a curative instruction to the jury to indicate that these comments of counsel are about legal standards or about what society's interest are [sic] to be in the verdict in this case are inappropriate comments and the jury should disregard them and they should resolve this case based on the facts that are here in this courtroom and this courtroom only. |
| THE COURT: | Okay. I'll, I'll give an instruction that they're to determine the facts in the law that I have given them. I think it's going to be difficult for them at this point in time to parse out since we passed that, and we've gone about a minute or two as to what comments we're talking about. So -- |
| [APPELLANT'S COUNSEL]: | Well, the Court sustained my objection to move to strike. |
| THE COURT: | And I did all of that. |
| [APPELLANT'S COUNSEL]: | It's not too late for (unintelligible). |
| THE COURT: | Well, at this point in time given the fact that we've now moved onto different arguments, I'm not going to highlight it. I think that's inappropriate. But I will tell them that they're to base their verdict based upon the facts and law of this case. All right? |

Appellant's counsel then requested a mistrial, which the trial court denied. When the parties returned from the bench conference, the trial court told the jury, "Okay. So, just

54

so you know this, this case is decided on the facts of this case and the law that I have given you. Go ahead counsel."

Appellant argues that by comparing Khafra to the victim in a domestic violence case, the State "appealed to the jury's fears and prejudices about victims of domestic violence, which prosecutors are repeatedly admonished by the appellate courts not to do." Appellant further alleges that the trial court erred in that it never sustained his objection to this comparison.

Initially, we note that in denying appellant's motion for a mistrial, the trial court considered the State's argument to be "fair comment" because appellant's counsel had portrayed Khafra as an independent decision-maker during appellant's closing argument. Indeed, it would be fair to characterize the thrust of defense counsel's closing argument as underscoring Khafra's independence. Appellant's counsel told the jury: "This kid wasn't dependent on anybody. This was an intelligent kid who was responsible for his own decisions and made decisions after calculating, after thinking, after weighing what he wanted to do." Appellant's counsel also emphasized Khafra's independence by telling the jury that Khafra disregarded his father's advice not to work in the tunnels, and that he willingly returned to work for appellant while aware of the hoarding conditions.

In any event, the caselaw confirms that any error was harmless. In *Spain*, the Court of Appeals explained that, "When assessing whether reversible error occurs when improper statements are made during closing argument, a reviewing court may consider several factors, including the severity of the remarks, the measures taken to cure any potential prejudice, and the weight of the evidence against the accused." 386 Md. at 159 (citing

55

*United States v. Melendez*, 57 F.3d 238, 241 (2d. Cir. 1995)). There, during closing argument in a trial for drug distribution, the prosecutor told the jury that it would have to weigh the credibility of the officer's testimony in the case, as well as that of a defense witness. *Id*. at 151. The prosecutor, however, told the jury that the officer would have to have engaged in "a lot of lying, in a lot of deception and a conspiracy of his own to come in here and tell you that what happened was not true. He would have to risk everything he has worked for. He would have to perjure himself on the stand." *Id*.

Recognizing that a trial court errs when it allows a prosecutor to vouch for the credibility of a witness, the Court of Appeals nevertheless held the error harmless. *Id*. at 154. The Court observed that the prosecutor's reference to the officer suffering adverse consequences by lying was "an isolated event that did not pervade the entire trial." *Id*. at 159. The Court further noted

> the likely diminution of prejudice from the prosecutor's comments as a result of the trial judge's contemporaneous reminder that they were only an attorney's argument, not evidence, as well as the pertinent instructions that the trial judge gave to the jury before sending it to deliberate. In response to the objection by defense counsel, the trial judge stated, "Okay, well the jury understand[s] that this of course is closing argument, and that they will [consider the statements to be] lawyers' arguments. Overruled."

*Id*.

> Although the trial court did not explicitly sustain the objection, the court
>
> reminded the jury that the prosecutor's statements only should be considered as argument, not evidence. By emphasizing the argumentative nature of closing arguments contemporaneously with the improper comments, the judge took some effort to eliminate the jury's potential confusion about what it just heard and therefore ameliorated any prejudice to the accused.

*Id*. at 159-60.

The Court found it particularly important that, before jury deliberations began, the trial court provided Maryland Criminal Pattern Jury Instruction § 3:10 "that emphasized the argumentative nature of closing arguments, and explicitly instructed the jurors as to relevant factors to consider and their roles as the sole judges of the credibility of the witnesses presented at trial." *Id*. at 160.

Finally, the Court considered the impact of the improper comment in light of the weight of the evidence against the accused. *Id*. at 161. The Court found "this factor, however, to be of somewhat less weight in this case. Although the record contain[ed] adequate evidence of Spain's guilt to support the convictions under a sufficiency analysis, [the Court could not] say that the evidence of Spain's guilt [was] truly overwhelming." *Id*. Nevertheless, the Court found that the improper remarks were not severe, that their impact was minimal, and that the court's instruction mitigated any prejudice. *Id*.

We find *Spain* instructive. Here, even if we were to assume that the prosecutor's comparison of Khafra to a domestic violence victim improperly appealed to the jury's fears and prejudices, any error was harmless. First, as in *Spain*, the prosecutor's comparison did not pervade the entire trial. *Id*. at 159. Rather, appellant only cites to this single instance in rebuttal argument as an example of the prosecutor comparing Khafra to a domestic violence victim. To provide context, we note that the State's closing and rebuttal argument spanned approximately sixty transcript pages. Next, similar to *Spain*, the trial court here provided an implicit reminder that closing arguments were neither evidence nor the controlling law, telling the jurors: "Okay. So, just so you know this, this case is decided on the facts of this case and the law that I have given you. Go ahead counsel." *Id*.

57

Although in *Spain* the instruction was contemporaneous, here the trial court, acknowledging that appellant's objection appeared to relate back to even earlier comments in rebuttal, decided not to re-highlight any objectionable language. That determination was properly within the court's discretion.

Additionally, before jury deliberations began, the court provided Maryland Criminal Pattern Jury Instructions § 2:00 regarding the binding nature of the instructions, and § 3:00 regarding what constitutes evidence. The court instructed the jury that "The instructions that I give about the law are binding upon you. In other words, you must apply the law as I explain it in arriving at your verdict. . . . You are the ones to decide the facts and apply the law to those facts." The court also instructed the jury, "Opening statements and closing arguments of the lawyers are not evidence[. T]hey are intended only to help you understand the evidence and apply it to the law." The court correctly instructed the jurors that they were to apply the law as the court explained it, and that the only purpose of closing arguments was to help them understand the evidence and apply it to the law provided by the court. As in *Spain*, these instructions mitigated any prejudice to appellant. *Id*. at 160.

Finally, we consider the weight of evidence of appellant's guilt. *Id*. at 161. We shall not attempt to recount all of the evidence, but we note that much of it was essentially undisputed. Although the jury concluded that appellant's conduct constituted an extreme disregard for human life, we have determined that the evidence was legally insufficient to support a conviction for depraved heart murder. And while the evidence was sufficient to support appellant's conviction for gross negligence involuntary manslaughter, "we cannot

58

say that the evidence of [appellant's] guilt is truly overwhelming." *Id.* As in *Spain*, "[w]e find this factor, however, to be of somewhat less weight in this case." *Id.*

Thus, as in *Spain*, the prosecutor's single improper remark over the course of a trial that spanned over two weeks, where the court properly instructed the jury regarding the law and the function of closing argument, persuades us that appellant did not suffer undue prejudice as a result of the allegedly improper comment during closing argument. *Id.*

F. *Cumulative Effect of Improper Comments*

Finally, appellant argues that although each statement alone could constitute reversible error, their cumulative effect also constitutes reversible error. We reject this argument because, as stated above, there was only one potential error emanating from closing argument—not sustaining appellant's objection to comparing Khafra to a domestic violence victim. Although we have concluded that any error in this regard was harmless, even if we were to assume error on this point, a single error, by definition, cannot be "cumulative."

IV. *FRANKS* HEARING

Appellant's final argument is that the circuit court erred in denying his request for a *Franks* hearing. According to appellant, Detective Beverley Then of the Montgomery County Department of Police made false and misleading statements in her search warrant affidavit, which improperly formed the probable cause necessary to obtain a search and seizure warrant authorizing the search of appellant's home. We need not recount Detective Then's alleged misrepresentations as they are immaterial to our resolution of this issue.

59

At a *Franks* hearing a defendant is given the opportunity to attack the veracity of an affiant's statements regarding a search warrant affidavit. *Thompson v. State*, 245 Md. App. 450, 463-64 (2020). "Again and again, it has been stressed that a *Franks* hearing is a rare and extraordinary exception 1) that must be expressly requested and 2) that will not be indulged unless rigorous threshold requirements have been satisfied." *Fitzgerald v. State*, 153 Md. App. 601, 642 (2003). These "rigorous threshold requirements" are widely accepted:

> To mandate an evidentiary hearing, the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross examine. There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof. They should point out specifically the portion of the warrant affidavit that is claimed to be false; and they should be accompanied by a statement of supporting reasons. Affidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained. Allegations of negligence or innocent mistake are insufficient. The deliberate falsity or reckless disregard whose impeachment is permitted today is only that of the affiant, not of any nongovernmental informant.

*Id*. at 643-44 (emphasis removed) (quoting *Franks*, 438 U.S. at 171).

In his brief, appellant baldly asserts, "Any evidence obtained from the execution of the September 11, 2017 warrant should have been excluded, or alternatively, this case should be remanded to conduct a full *Franks* hearing." But even assuming *arguendo* that appellant was entitled to a *Franks* hearing and that, based on a *Franks* violation, the court should have suppressed the evidence seized from his home, we cannot grant appellant's requested relief because appellant has utterly failed to identify a single piece of evidence seized from his home that was admitted against him at trial. It is not our obligation to comb through the record to determine whether evidence obtained as a result of the search warrant

was admitted at trial. *See Rollins v. Capital Plaza Assocs., L.P.*, 181 Md. App. 188, 201 (2008) (stating that "[w]e cannot be expected to delve through the record to unearth factual support favorable to [the] appellant (quoting *von Lusch v. State*, 31 Md. App. 271, 282 (1976), *rev'd on other grounds* 279 Md. 255 (1977))). Nor is it our obligation to engage in the daunting task presented by this voluminous record of determining whether any such evidence may have been obtained from a source independent of the search warrant.

On review, we apply the longstanding principle that improperly admitted evidence must be prejudicial to warrant reversible error. *See* Maryland Rule 5-103(a) (stating generally that "Error may not be predicated upon a ruling that admits or excludes evidence unless the party is prejudiced by the ruling"). "[P]rejudice is not presumed 'when the jury considers evidence admitted by the trial court which is later determined to have been erroneously admitted.'" *Merritt v. State*, 367 Md. 17, 33 (2001) (citing *State Deposit v. Billman*, 321 Md. 3, 16 (1990)). Rather, it is well settled in Maryland that we will review prejudice through the lens of harmless error:

> when an appellant, in a criminal case, establishes error, unless a reviewing court, upon its own independent review of the record, is able to declare a belief, beyond a reasonable doubt, that the error in no way influenced the verdict, such error cannot be deemed 'harmless' and a reversal is mandated.

*Dorsey v. State*, 276 Md. 638, 659 (1976). Furthermore,

> In a criminal jury trial, the jury is the trier of fact. For this reason, it is responsible for weighing the evidence and rendering the final verdict. Therefore, any factor that relates to the jury's perspective of the case necessarily is a significant factor in the harmless error analysis. *Thus, harmless error factors must be considered with a focus on the effect of erroneously admitted, or excluded, evidence on the jury*.

*Dionas v. State*, 436 Md. 97, 109 (2013) (emphasis added).

61

Because appellant has failed to identify a single piece of evidence admitted at his trial that he claims should have been suppressed due to Detective Then's alleged misrepresentations, it is impossible for us to engage in a harmless error analysis to determine if the admission of such evidence constituted reversible error.  We therefore reject appellant's argument based on alleged *Franks* violations.

**JUDGMENT OF CONVICTION FOR DEPRAVED HEART MURDER REVERSED. CONVICTION FOR INVOLUNTARY MANSLAUGHTER AFFIRMED.  CASE REMANDED TO CIRCUIT COURT FOR MONTGOMERY COUNTY FOR SENTENCING ON INVOLUNTARY MANSLAUGHTER CONVICTION. COSTS TO BE DIVIDED EQUALLY BETWEEN APPELLANT AND MONTGOMERY COUNTY.**

The correction notice(s) for this opinion(s) can be found here:

https://mdcourts.gov/sites/default/files/import/appellate/correctionnotices/cosa/0794s19cn.pdf